```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
RALEIGH L. HARRIS

                        Plaintiff,            06-CV-6523T

              v.                              DECISION
                                              and ORDER
JO ANNE B. BARNHART, Commissioner
of Social Security

                        Defendant.
_____
```

## INTRODUCTION

In a decision dated April 28, 2006, Administrative Law Judge ("ALJ") Larry K. Banks found that Raleigh L. Harris ("plaintiff" or "Harris") was not eligible for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") as provided in Titles II and XVI respectively of the Social Security Act ("the Act"). The ALJ found that the plaintiff retained the residual functional capacity to perform work that exists in significant numbers in the national economy and, therefore, he was not disabled. The plaintiff seeks a review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).[1]  The issue presented is whether or not the Commissioner's decision denying plaintiff disability benefits is supported by substantial evidence in the record.

---

[1] Plaintiff appeared pro se at his hearing on July 1, 2005 and waived the right to representation. (Tr. 339, 340.) However, he is represented by counsel on his appeal from the ALJ's decision.

**BACKGROUND**

The plaintiff, Raleigh Harris, was born December 26, 1958 and was forty-seven when he filed for Disability and Supplemental Security Income Insurance benefits on March 4, 2003. Harris stated that he was unable to work due to bipolar disorder, back pain, and left knee surgery (Tr 70, 97-98, 345). Based on these alleged impairments, plaintiff claims that he was unable to stand for long periods of time, lift over twenty pounds, and could not perform repeated movements (Tr. 97, 349, 350).

On November 4, 2002 the plaintiff was examined by Doctor Paul Peartree, who found degenerative changes in plaintiff's knee, as well as ACL tears, and meniscal tears. In a report, Doctor Peartree states that the plaintiff "denies significant pain" and has a "partial moderate permanent disability" (Tr. 147, 148). Overall, in Doctor Peartree's opinion, the plaintiff lost 40% use of his knee due to the degeneration (Tr. 147-48).

On March 3, 2003 the plaintiff was involuntarily committed to the Rochester Psychiatric Center ("RPC") after he was arrested for violating an Order of Protection prohibiting him from communicating with his estranged wife. Plaintiff was stabilized, and released on the March 27, 2003. However, following his discharge, he was non-compliant with his prescribed medications and his condition worsened until he was readmitted to the Psychiatric Center on April 23, 2003 (Tr. 149-152). At that time, Harris was given the

medications Zyprexa 20 mg, Depakote 750 mg, and Klonopin 1 mg. On May 27, 2003 the plaintiff received a physiological examination by Doctor Igor Kashtan. Previously, Harris had been non-compliant with treatment, and used alcohol, cocaine, and marijuana (Tr. 150). At the time of the appointment, it was noted that Harris "is more compliant with all his medications and unit regulations"(Tr. 151). Furthermore, it was recorded that the plaintiff's physical condition was stable and he continued to remain with good behavior due to the medication. Finally, the psychiatrist stated that it was "crucial for his condition" to remain compliant with all medications (Tr. 152). In a follow up report, Dr. Martin Lineham and Dr. Dawood stated that the plaintiff was "psychiatrically stable" and was not considered a danger to himself or others (Tr. 158).

According to consultative examiner Dr. Michael Obrecht's report on July 21, 2003, the plaintiff was obese, had a normal gait, and only had mild difficulty walking. He was diagnosed with osteoarthritis of the knee, chronic lumbarsacral back pain, and hypertension (Tr. 179). According to Dr. Obrecht, Harris could rise from a chair without help, and did not use any assistive device. Dr. Obrecht determined that plaintiff's prognosis was stable, with a mild to moderate lifting restriction. The plaintiff had full range of motion with his shoulders, elbows, forearms, wrists, hips, knees, and ankles. Harris' joints were found to be

table (Tr. 179). Dr. Obrecht strongly suggested trying to loose weight and stop smoking.

The plaintiff was also treated by Dr. Tai Nguyen at Viahealth Medical group in October of 2002. Harris mostly complained of back pain and was prescribed anti-inflammatory drugs and was recommended to refrain from heavy lifting (Tr. 221). On May 19, 2005, Dr. Nguyen found that the plaintiff's back was only mildly tender and nonsteroidal treatment was suggested (Tr. 229). Harris was also seen by State Agency psychiatric consultant George Burnett, on August 29, 2003. Dr. Burnett found that the plaintiff was capable of performing simple, repetitive tasks, because his bipolar disorder was well controlled by medication and he was able to maintain daily functions (Tr. 194).

In the plaintiff's release report from the New York State Office of Mental Health, Dr. Satyavathy Sarakanti stated that "due to non-compliance with treatment and medications he decompensates and as a result his judgment becomes impaired" (Tr. 214).

Plaintiff was then referred for outpatient treatment through United Health System. (Tr. 260-64.) Plaintiff was treated by psychiatrist Dr. Muhammad Dawood and psychologist Dr. Martin G. Lineham. Plaintiff told Dr. Lineham that he last drank on July 4, 2003. (Tr. 266.) On July 10, 2003, plaintiff was doing better, appeared motivated, and had been consistent in the prior week with doctor's appointments. (Tr. 267.) It was noted that he was "settling into" his security guard job. (Id.)

Plaintiff missed six scheduled appointments and did not return for treatment until January 6, 2004. (Tr. 268-73.) It was noted that plaintiff was hospitalized on December 23, 2003 for two weeks with psychotic symptoms. (Tr. 273.) Plaintiff's symptoms were currently under control having been taking medication regularly. (Id.) Plaintiff missed an appointment on January 19, 2004 reportedly because he was "getting too busy to come." (Tr. 273.) He showed up an hour late to his appointment on January 21, 2004, and left while waiting to see if the doctor could see him at that time. (Tr. 274.) On January 26, 2004, plaintiff was psychiatrically stable. (Tr. 275.) He was a "no show" for his next appointment on February 10, 2004. (Id.) Plaintiff was reported as stable on his appointments when complaint with his medications. (Tr. 276-77.) Cocaine and cannabis use was reported on March 5, 2004, and plaintiff told Dr. Lineham that "he does not let this interfere with his life." (Tr. 277.) On March 9, 2004, subtherapeutic Depakote levels were noted. (Tr. 278.) On March 17, 2004, Dr. Dawood reported that plaintiff had "poor compliance with treatment" but that plaintiff was "stable on low dose of medication and tolerating medications fairly well. (Tr. 258.) Current GAF was 55. (Tr. 259.)

On April 6, 2004, plaintiff told Dr. Dawood that he had not used drugs or alcohol since November 2003. (Tr. 279.) He was looking for work and had gone on a job interview the day before. (Id.) Plaintiff was a "no show" for appointments on April 15, May 4, and June 3, 2004. (Tr. 280-81.) He cancelled an

appointment on June 16, 2004, claiming that he had car problems. (Tr. 282.) On July 19, 2004, Dr. Lineham responded to a call from a police liaison, after plaintiff had been found wandering in other people's backyards. Dr. Lineham called the Mobile Crisis Team and plaintiff was then taken by the team for further evaluation. Id. Plaintiff was a no show for his initial prescreen appointment for CDTP. (Tr. 283.)

On August 6, 2004, it was reported that plaintiff was seen urinating in his landlord's backyard in the presence of her four year old daughter and some neighborhood children. (Tr. 284.) It was also reported that he later exposed himself to the landlord's daughter. The police were contacted and plaintiff agreed to go back to Unity Psychiatric Emergency Center for evaluation. Id. Plaintiff did not show up for follow-up appointments. (Tr. 285.)

On November 30, 2004, psychiatrist Dr. Satyavthy Sarakanti reported that plaintiff was mental hygiene arrested on August 27, 2004 for being found walking down the street with a table leg and a ball speaking incoherently and being hyper religious. (Tr. 212-18.) Plaintiff was transferred to the New York State Office of Mental Health in Rochester for treatment. He was readmitted to Rochester Psychiatric Center on October 1, 2004. Plaintiff was noted to be non-compliant with treatment and medications and using drugs and alcohol and decompensated as a result to the extent that he got into legal difficulties. Plaintiff was discharged on November 19, 2004 in stable condition with a "much improved" condition and a GAF of 60. Id.

On November 23, 2004, plaintiff was seen by Dr. Dawood and Dr. Lineham. (Tr. 286-87.) He was psychiatrically stable. (Id.) Dr. Dawood advised rehabilitation for drug and alcohol use and explained that it was important for the plaintiff to remain drugs free for the treatment of dipolar disorder. (Tr. 287.) Low Depakote level was noted again on February 10, 2005. (Tr. 290.) Plaintiff reported that he was compliant with medications and drug and alcohol free on March 11, 2005. (Tr. 291.) Plaintiff attended therapy sessions and was stable for the next few months. (Tr. 291-99.)

In April 2005 and 2006, Dr. Lineham indicated in a form that plaintiff should not work at that time and that his restrictions were expected to last longer than 90 days. (Tr. 211, 325-26.)

On July 21, 2003, plaintiff was examined by consultative psychologist Melvin Zax, Ph.D. (Tr. 172-75.) Plaintiff reported that he lived alone in a house that he owned. (Tr. 172.) He told Dr. Zax that he was working part-time in a security job but stated that some weeks he worked as much as 35 hours.(Id.) Upon examination, plaintiff was cooperative and his manner of relating was adequate. (Tr. 173.) He spoke "very loudly" and had "a somewhat military way of presenting things with a number of 'yes sir' and 'no sir' and so forth." (Id.) Plaintiff's gait was normal. (Tr. 174.) Eye contact was appropriate. His thought process was coherent. Plaintiff's displayed a full range of appropriate affect. His mood was "loud and forceful." Plaintiff was oriented as to person, place, and time. Plaintiff related that

he can dress and bathe himself, cook, clean, do laundry and shop. He can manage his own money and drive. Plaintiff also told Dr. Zax that he has friends with whom he drinks on weekends, and they go to the movies. Plaintiff stated that he was very close to his family. On an average day, he works at fixing up his place that he just moved into, reads, looks at magazines and watches television. Id. Dr. Zax opined that plaintiff is able to follow and understand simple directions, and he is capable of working. (Tr. 174-75.)

On August 29, 2003, George J. Burnett, M.D., a State Agency psychiatric consultant, found that plaintiff was capable of performing simple, repetitive tasks in a low contact environment (Tr. 194; see Tr. 182-99). The psychiatric consultant provided specific reasons for his opinion, showing that claimant has intact activities of daily living and his bipolar disorder is well controlled by medication. Dr. Burnett stated that plaintiff's GAF was 55, which indicates only moderate symptoms. Id.

## PROCEDURAL HISTORY

Plaintiff protectively filed applications for SSI and DIB on April 17, 2003. His claims were denied initially, and a hearing was held on July 1, 2005 before ALJ Larry Banks. the ALJ denied plaintiff's applications for benefits, and the ALJ's decision became the final decision of the Commissioner on August 30, 2006 when the Social Security Appeals Council denied plaintiff's request for review.

The Commissioner moves for judgement on the pleadings stating that the ALJ's decision is correct, is supported by substantial

evidence in the record, and is in accordance with the applicable law.  Plaintiff cross-moves for judgment on the pleadings seeking a reversal of the Commissioner's decision.

## DISCUSSION

### I. JURISDICTION AND SCOPE OF REVIEW

Title 42, Section 405(g) of the United States Code grants jurisdiction to Federal District Courts to hear claims based on the denial of Social Security benefits.  Mathews v. Eldridge, 424 U.S. 319, 320 (1976).  Additionally, Section 405(g) directs that when considering such a claim, the court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.  See Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998); see also Williams v. Comm'r of Soc. Sec., No. 06-2019-cv, 2007 U.S. App. Lexis 9396, at *3 (2d Cir. Apr. 24, 2007).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Metropolitan Stevedore Co. v. Rambo, 521 U.S. 121, 149 (1997) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Section 405(g) thus limits this court's scope of review to two inquiries: (1) whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole, and (2) whether the Commissioner's conclusions are based upon an erroneous legal standard.  Green-Younger v. Barnhart, 335 F. 3d 99, 105-06 (2d Cir. 2003); see also Wagner v. Secretary of Health and Human Serv., 906 F. 2d 856, 860

(2d Cir 1990) (holding that review of the Secretary's decision is not <u>de</u> <u>novo</u>, and that the Secretary's findings are conclusive if supported by substantial evidence).

Defendant moves for judgment on the pleadings pursuant to 42 U.S.C. 405(g) as well as Rule 12(c) of the Federal Rules of Civil Procedure.  Section 405(g) provides that the District Court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g) (2007). Under Rule 12(c), judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F. 2d 639, 642 (2d Cir. 1988).  Because this court determines that the findings of the Commissioner are supported by substantial evidence in the record, and in accordance with applicable law, judgment on the pleadings is hereby granted in favor of the Defendant.

**II. THE COMMISSIONER'S DECISION TO DENY PLAINTIFF BENEFITS IS SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD**

**A. Standard for Entitlement to Disability Benefits**

Under the Social Security Act, a disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months..." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual is considered disabled only if his impairments are so severe that he is unable to perform his past relevant work, or any substantial gainful activity existing in the national economy.

"Substantial gainful activity" is defined as "work that . . . [i]nvolves doing significant and productive physical or mental duties . . . and [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. Work is considered to be "substantial" even if it is part-time, for less money, or is less skilled than a previous job.

## B.  The SSA's Five-Step Disability Evaluation Process

In order to determine whether the plaintiff is disabled, the Commissioner must follow a five-step sequential evaluation process as set forth in §§ 404.1520 and 416.920 of the Social Security Administration regulations. Pursuant to the evaluation process:

(i) if the claimant is performing substantial gainful work, he is not disabled;

(ii) if the claimant is not performing substantial gainful work, his impairment(s) must be "severe" before he can be found disabled;

(iii) if the claimant is not performing substantial gainful work and has a "severe" impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment (or impairments) meets or medically equals a listed impairment contained in Appendix 1, Subpart P, Regulation No. 4, the claimant is presumed disabled without further inquiry

(iv) if the claimant's impairment(s) does not prevent him from doing his past relevant work, he is not disabled;

(v) even if the claimants's impairment(s) prevent him from performing his past relevant work, if other work exists in

significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The ALJ performed the required five-step process and determined: (i) that the plaintiff has not engaged in substantial gainful work since February 2004; (ii) the plaintiff's conditions were considered "severe" within the meaning of the regulations; (iii) the plaintiff's conditions did not meet or medically equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; 20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d) and 416.926; (iv) the claimant is unable to perform his past relevant work; and (v) the plaintiff retained the residual functional capacity (RFC) to perform other unskilled jobs that exist in the national economy.

In step five of the evaluation, the burden shifts to the Commissioner, who must prove that the claimant is capable of performing other gainful employment existing in the national economy. The Commissioner must take into account the individual's age, work experience, education, and his residual functional capacity. 20 C.F.R. 404.1520 (f); Carroll v. Secretary of Health and Human Serv., 705 F. 2d 638, 642, (2d Cir. 1983). Where there exists a combination of exertional and nonexertional limitations, an ALJ must evaluate whether the occupational base for exertional work is eroded by the non-exertional limitations. SSR 83-14, Bapp v. Bowen, 802 F. 2d 601 (2d Cir. 1986).

In the instant case, the ALJ determined that the plaintiff retained the residual functional capacity to perform light work with no climbing of ropes/ladders/scaffolds and is limited to

performing simple routine unskilled tasks involving no more than minimal contact with the public. (Tr. 22.)

## C. **Vocational Expert Testimony**

At the administrative hearing on July 1, 2005, vocational expert Peter Manzi testified. (Tr. 354-58.) Throughout his testimony, Mr. Manzi used the parlance and definitions found in the Dictionary of Occupational Titles. Mr. Manzi testified that a person who retained the ability to perform light work which does not require climbing ropes, ladders, or scaffolds; and who can perform other positive moves such as sweeping on a frequent basis, but was limited to simple, routine unskilled tasks and no more than minimal contact with the public, and who had plaintiff's vocational and educational background, could perform jobs that exist in significant numbers in the national economy. Mr. Manzi testified that such a person could not perform plaintiff's past work but that there were other jobs that the person could do. The jobs Mr. Manzi identified included photo copy machine operator (125 jobs regionally and 22,954 nationally); laundry worker (423 jobs regionally and 133,174 nationally); and collator operator (236 jobs regionally and 49,655 nationally). (Tr. 356.)

## D. **The ALJ's Residual Functional Capacity Determination Is Supported By Substantial Evidence In The Record**.

After reviewing the record in this case including the opinions of the consultative physicians, I conclude that the ALJ's decision that the claimant is not disabled is supported by substantial evidence in the record. Of particular note, plaintiff's

psychiatric disorder is manageable and stable if the plaintiff is compliant with taking his prescribed medications. (Tr. 24, 249-299.)

The ALJ's determination that plaintiff retains the residual functional capacity to perform light work with no climbing of ropes/ladders/scaffolds and limited to performing simple routine unskilled tasks involving no more than minimal contact with the public is supported by both medical and testimonial evidence. (Tr. 22.)

The ALJ noted that the medical evidence revealed that when plaintiff is compliant with prescribed treatment, his psychiatric symptoms are well controlled. (Tr. 23, 152.) The Commissioner notes that failure to follow prescribed treatment can be a basis for denial of benefits. See 20 C.F.R. §§ 404.1530, 416.930. After plaintiff was stabilized and released from RRFU in March 2003, he ceased taking prescribed medications and used alcohol, cocaine, and cannabis. (Tr. 149-52.) The medical evidence supports the conclusion that this directly led to psychotic decompensation and plaintiff's re-admission to RPC in April 2003. (Id.) After plaintiff's release, he regularly attended psychotherapy sessions and psychiatric appointments for a few months and, during this period, he was "doing better," appeared motivated, and was performing his security guard job. (Tr. 267.) Subsequently he missed six scheduled appointments, and was hospitalized on December 23, 2003 for two weeks with psychotic symptoms. (Tr. 268-73.) His non-compliance continued, and he reported using cocaine

and cannabis.  Subtherapeutic Depakote levels were noted in the record, indicating that plaintiff was not taking the medication as prescribed.  (Tr. 277-78.)

The record is replete with examples of non-compliance with taking prescribed medications for his mental problems, and with no-shows for appointments for therapy.  (Tr. 275-77, 280-81, 283.)  See § 404.1530(a)(b) (failure to follow prescribed treatment without good reason will lead to a finding of no disability).

## **CONCLUSION**

After a thorough review of the evidence in the record, I find that there is substantial evidence to support the Commissioner's decision that the plaintiff is not disabled within the meaning of the Act.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted and the plaintiff's cross-motion for judgment on the pleadings is denied.  Plaintiff's complaint is dismissed with prejudice.

ALL OF THE ABOVE IS SO ORDERED.


S/Michael A. Telesca

_____
       MICHAEL A. TELESCA
    United States District Judge


Dated:    Rochester, New York
          August 21, 2008